A. Clifford Edwards
Triel D. Culver
EDWARDS, FRICKLE & CULVER
P.O. Box 20039
Billings, Montana  59104
Telephone:  (406) 256-8155
triel@edwardslawfirm.org

John Heenan
HEENAN LAW FIRM
P.O. Box 2278
Billings, Montana 59103
Telephone:  (406) 839-9091
john@heenanlawfirm.com

Royal B. Lea, III*
Benjamin R. Bingham*
BINGHAM & LEA, P.C.
319 Maverick Street
San Antonio, Texas 78212
Telephone: (210) 224-1819
royal@binghamandlea.com
ben@binghamandlea.com
*Admitted *pro hac vice*

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JEANIE COLE,<br>CATHY SWITTERS,<br>JAMES MOSTI, and<br>KAREN JENNINGS,<br><br>        Plaintiffs,<br><br>v.<br><br>PORTFOLIO RECOVERY<br>ASSOCIATES, LLC et al.,<br><br>        Defendants. | Cause No: CV-08-036-GF-RKS<br><br>**THIRD AMENDED COMPLAINT**<br><br>**PUTATIVE CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

COME NOW Plaintiffs, on behalf of themselves and all others similarly situated, by and through their counsel of record, and for their Third Amended Complaint against Defendants, allege as follows:

## SUMMARY OF CASE

1.      Defendants, by injecting false, misleading, and fraudulent affidavits into legal proceedings throughout the country in the attempted collection of debts, engaged in a concerted practice of fraudulent, misleading and unlawful debt collection and litigation activity against Plaintiffs and many others like them. Defendants' collective conduct and illegal enterprise as described herein and as will be proven at trial is a complete affront to the legal system, as well as the tens of thousands of individuals who suffered adverse consequences as a result of Defendants' collective fraudulent conduct.  Plaintiffs, on behalf of themselves and others similarly situated, bring this action against Defendant Portfolio Recovery Associates, LLC ("PRA") in accordance with and to remedy PRA's violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") and against Defendants in accordance with and to remedy Defendants' violations the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et. seq. ("FDCPA") and related state law obligations pursuant to the choice of law provisions in the pertinent credit card contract brought as supplemental claims thereto.

## PARTIES AND JURISDICTION

2.     Plaintiff Jeanie Cole was at all times relevant hereto a resident and citizen of Hill County, Montana.

3.     Plaintiff Cathy Switters was at all times relevant hereto a resident and citizen of the State of North Dakota.

4.     Plaintiff James Mosti was at all times relevant hereto a resident and citizen of Flathead County, Montana.

5.     Plaintiff Karen Jennings was at all times relevant hereto a resident and citizen of Codington County, South Dakota.

6.     Defendant Portfolio Recovery Associates (hereafter "PRA") is a foreign limited liability company existing pursuant to the laws of the State of Delaware.   PRA maintains its principal business address at 120 Corporate Boulevard, Norfolk, Virginia.  PRA is engaged in the business of purchasing debt (a "debt buyer") and debt collection activities.   PRA is a "debt collector" as defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.  PRA has previously appeared in this case.

7.     Defendant Lorraine Kunkle a/k/a Martha Kunkle is a resident and citizen of the State of Texas.  Defendant Kunkle was an employee of Washington Mutual Bank at all pertinent times hereto.  Kunkle has previously appeared in this case.

8.      Defendant Amy Jo Cauthern-Munoz, is a resident, citizen and Notary Public of the State of Texas.  At all pertinent times hereto, Defendant Cauthern-Munoz acted in an official capacity as a notary public in and for the State of Texas. Defendant Cauthern-Munoz was an employee of Washington Mutual Bank at all pertinent times hereto.  Cauthern-Munoz has previously appeared in this case.

9.      Defendant Johnson, Rodenburg & Lauinger (hereafter "JRL") is a foreign partnership engaged in the business of debt collection as well as the practice of law in the State of Montana, and is a "debt collector" as defined under the FDCPA.   JRL's principal place of business is 1004 East Central Ave., Bismarck, North Dakota.  No JRL attorney is physically located in the State of Montana, but several are licensed to practice law in the State of Montana.  JRL regularly files lawsuits against Montana residents in Montana courts as part of its debt collection activities and is a "debt collector" as defined by 15 U.S.C. 1692a(6).  JRL has previously appeared in this case.

10.     Defendant CACV of Colorado, LLC (hereafter "CACV") is a foreign limited liability company existing pursuant to the laws of the State of Colorado. CACV maintains its principal business address at 4340 S. Monaco Street, 2nd Floor, Denver, CO 80237.  CACV is engaged in the business of purchasing debt (a "debt buyer") and debt collection activities.  CACV is a "debt collector" as defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.  CACV has

previously appeared in this case.

11.     Defendant CACH of Colorado, LLC (hereafter "CACH") is a foreign limited liability company existing pursuant to the laws of the State of _____. CACH maintains its principal business address at _____. CACH is engaged in the business of purchasing debt (a "debt buyer") and debt collection activities.   CACH is a "debt collector" as defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

12.     Defendants John Doe I is the officer at WaMu who authorized the implementation of the false affidavit factory at WaMu described below in this Complaint.

13.     Defendants John Does II – X are individuals or business entities unknown to Plaintiffs at this time, and therefore, are sued by fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each of Defendants John Does II – X was in some manner legally responsible for the events, happenings, injuries, and damages alleged in this Complaint.

14.     Jurisdiction over Plaintiffs' claims is proper in this Court pursuant to RICO, 18 U.S.C. § 1961 et seq.; FDCPA, 15 U.S.C. § 1692k(d); 18 U.S.C. § 1961 and 28 U.S.C. § 1337.   This Court has supplemental jurisdiction to hear and adjudicate Plaintiffs' state law causes of action pursuant to 28 U.S.C. § 1367.

15.    Personal jurisdiction is proper as to all Defendants, each of whom has conducted debt collection and/or litigation activities in the State of Montana, availed itself of the Montana court system in its capacity as a debt collector and/or law firm, and committed unlawful conduct towards Plaintiffs Cole and Mosti, Montana residents and citizens.  Personal jurisdiction is proper over all Defendants because each of them conducts or has conducted business in Montana.

16.    This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) (hereafter "CAFA"), in that the matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are well in excess of 100 members of the proposed class, and at least one member of the class is a citizen of a different state than Defendants.  In addition to the federal claims nationally applicable, the putative class is all subject to and has the right to invoke substantive New Hampshire law pursuant to a choice of law provision contained in the standard Providian credit card contract to which they were each a party.

17.    This Court has general and specific personal jurisdiction over Defendants.  Defendants were each engaged in unfair business practices and a racketeering enterprise directed at and/or causing injury to persons residing, located or doing business throughout the United States.  Plaintiffs Cole and Mosti have both lived in Montana for many years; and well before Defendants

commenced the state cases against each of the respective Plaintiffs as described below.  Defendants knew or should have known that their conduct on which this case is based was directed significantly at Plaintiffs Cole and Mosti in the State of Montana at the time of their conduct.  Defendants knew or should have known that Plaintiffs Cole and Mosti resided in Montana at the time they created or used the false and misleading affidavits against Plaintiffs Cole and Mosti in the separate state court cases described below.

18.    Venue is proper in the Great Falls Division because Plaintiff Cole is a Hill County, Montana resident, the pertinent facts as to Plaintiff Cole's claim occurred in Hill County, Montana, and Defendants all transact business or are otherwise found within the Great Falls Division.

19.    The business activities of Defendants at issue in this Amended Complaint were within the flow of and substantially affected interstate trade and commerce.  There has been a continuous and uninterrupted flow of activities in interstate commerce throughout the class period.

## FACTS

### The WaMu Fictitious Affidavit Factory

20.    On August 17, 2006, PRA, by and through the JRL law firm, sued Ms. Cole on an alleged Providian National Bank credit card debt which PRA contended was assigned to it by Providian National Bank.  (*Portfolio Recovery Associates,*

*LLC v. Jeanie Cole*, Cause No. DV 06-134, in the Twelfth Judicial District Court of Montana) (Hon. Judge Rice, presiding) (hereafter the "Cole state court case.").

21.     In the Cole state court case, PRA, by and through the JRL law firm, produced and represented to Ms. Cole that she was subject to the terms of a Providian National Bank credit card agreement (hereafter "the Providian Agreement" attached hereto as **Exhibit "A"**).  Pursuant to Paragraph 15 of the Providian Agreement, "No matter where you live, this Agreement and your Account are governed by federal law and by New Hampshire law."  Upon information and belief, all of the putative class members herein were subject to a similar provision providing that New Hampshire law applied "no matter where you live."

22.     On May 7, 2007, Ms. Cole filed a motion for summary judgment in the Cole state court case, asserting that PRA had failed to prove it was a real party in interest or otherwise had standing to sue her.

23.     On May 25, 2007, PRA, by and through the JRL law firm, filed by mail a brief in opposition to Ms. Cole's summary judgment motion.  The brief included, and relied upon, an affidavit provided by a "Martha Kunkle" (hereafter "the Kunkle Affidavit" attached hereto as **Exhibit "B"**).  "Martha Kunkle," according to the affidavit, purported to be the "designated agent of Providian National Bank ("Providian"), a national banking association, one of the seller [sic]

in that certain Purchase and Sales Agreement by and among Providian National Bank, Providian Bank and Portfolio Recovery Associates ("Purchaser"), dated as of 12/05/05 ("the Agreement")." The Kunkle Affidavit represented that Ms. Cole's account and amount due was "true and correct" "to the best of my knowledge."

24. The affidavit was purportedly signed and executed by a "Martha Kunkle/mm" and notarized by Defendant Amy Jo Cauthern-Munoz as reproduced here:

Executed on May 24, 2007 at Arlington, Texas.

_Martha Kunkle/mm_ ; Martha Kunkle, Designated Agent

Subscribed and sworn to me this 24th day of May, 2007.

Notary Public

Amy Jo Cauthern-Munoz
My Commission Expires
11/27/2010

25. Ms. Cole subsequently obtained information indicating that the signature on the Kunkle Affidavit was false and misleading. Specifically, Ms. Cole discovered another affidavit from "Martha Kunkle" with a different signature. Ms. Cole supplied this information to Judge Rice in the state court case on July 17, 2007.

26.     On July 19, 2007, Judge Rice held a hearing on Ms. Cole's summary judgment motion.   Judge Rice, at that time, expressed concerns about the authenticity and veracity of the affidavit.

27.     Judge Rice then ordered PRA to make "Martha Kunkle" and the notary, Defendant Cauthern Munoz, available for deposition in Montana.  PRA, by and through the JRL law firm, disregarded Judge Rice's order.

28.     In November of 2008, Judge Rice granted summary judgment in favor of Ms. Cole and imposed sanctions against PRA in excess of $6,000 for PRA's failure to make Defendants Kunkle and Cauthern-Munoz available for deposition.

29.     Ms. Cole incurred attorney's fees as a consequence of defending the lawsuit brought against her by PRA and JRL and, specifically, as a consequence of responding to PRA and JRL's insertion of the Kunkle Affidavit into the lawsuit PRA brought against her.

30.     On April 20, 2007, CACV, by and through the JRL law firm, sued Ms. Switters on an alleged Providian Bank credit card debt which CACV contended was assigned to it by Providian Bank.  (*CACV of Colorado, LLC v. Cathy Switters,* Cause No.07-C-360, in the Stutsman, North Dakota District Court) (Hon. Daniel D. Narum, presiding) (hereafter the "Switters state court case.")

31.     On July 13, 2007, JRL, by and through attorney Charles Dendy, filed by mail an "Affidavit of No Answer, Identification, Non-Military Status and Proof

of Claim" in the Switters state court case.  In Mr. Dendy's affidavit, he swore to the Court: "I further state that I have examined the accounts set forth in certain correspondence, copy(ies) of which is/are attached and offered in evidence in the above-entitled action and that there is now due by the defendant and owing to the plaintiff on the debt set forth in the complaint … ."  Attached to Mr. Dendy's affidavit and filed with the Court in the Switters state court case was an affidavit purportedly provided by a "Martha Kunkle" (attached hereto as **Exhibit "C"**). "Martha Kunkle," according to the affidavit, purported to be the "designated agent of Providian National Bank ("Providian"), a national banking association, one of the sellers in that certain Purchase and Sales Agreement by and among Providian National Bank, Providian Bank and CACV of Colorado, LLC ("Purchaser"), dated as of 8/20/2003 ("the Agreement")."  The Kunkle Affidavit represented that Ms. Switter's account and amount due was "true and correct" "to the best of my knowledge."

32.   The affidavit in the Switters state court case was purportedly signed and executed by a "Martha Kunkle/mm" and notarized by Defendant Amy Jo Cauthern-Munoz as reproduced here:

Executed on January 24, 2007, at Arlington, Texas.

 Martha Kunkle, Designated Agent

Sworn to before me this
24th day of January, 2007

_____
Notary Public

33.     Despite the fact that JRL was certainly aware about the issues of the authenticity and veracity of the Kunkle affidavits as raised by Ms. Cole and Judge Rice in the Cole state court case, JRL never made any effort to correct the record or apprise Judge Narum in the Switters state court case.  Consequently, on July 19, 2007, default judgment was entered in favor of CACV and against Ms. Switters in the Switters state court case in the amount of $1,709.82, plus interest and costs.

34.     On July 31, 2007, JRL served Ms. Switters with debtor's interrogatories pursuant to Rule 69 of the North Dakota rules of procedure.  When Ms. Switters failed to respond to them, JRL filed a motion for a contempt hearing against Ms. Switters, which the court set for November 14, 2007.  Prior to the hearing, Ms. Switters tendered to CACV paid the judgment in full, unaware that the Kunkle affidavit produced by JRL and relied upon by JRL in Mr. Dendy's affidavit was known by JRL to be false.

35.     On September 12, 2006, CACV, by and through the JRL law firm, sued Mr. Mosti on an alleged Providian National Bank credit card debt which

CACV contended was assigned to it by Providian National Bank.  (*CACV of Colorado, LLC v. James R. Mosti,* Cause No. DV-06-744(B), in the Eleventh Judicial District Court of Montana) (Hon. Judge Curtis, presiding) (hereafter the "Mosti state court case").

36.    In the Mosti state court case, CACV, by and through the JRL law firm, produced and represented to Mr. Mosti that he was subject to the terms of a Providian National Bank credit card agreement substantially similar to the Providian Agreement attached as Exhibit "A."  Pursuant to Paragraph 16 of the agreement provided to Mr. Mosti, "No matter where you live, this Agreement and Your Account are governed by federal law and by New Hampshire law."

37.    On July 25, 2008, CACV, by and through the JRL law firm, filed by mail a motion for summary judgment seeking summary judgment in its favor and against Mr. Mosti in the Mosti state court case.  CACV, by and through the JRL law firm, relied on, as part of its motion for summary judgment, a "Providian national bank affidavit" (attached hereto as **Exhibit "D"**).  The affidavit, purported to be from the "designated agent of Providian National Bank ("Providian"), a national banking association, one of the sellers in that certain Purchase and Sales Agreement by and among Providian National Bank, Providian Bank and CACV of Colorado, LLC ("Purchaser"), dated as of 12/30/2004 ("the Agreement")."  The affidavit represented that Mr. Mosti's account and amount due was "true and

correct" "to the best of my knowledge."  The affidavit is in the same form as the affidavits referenced in the Cole state court case and Switters state court case, the only difference being that there is no indication of who even purportedly executed the affidavit:



38.    Upon information and belief, the affidavit was signed in a name other than the true name of the signer.  Specifically, upon information and belief, the affidavit was signed under the name "Jeffrey Meek" by an individual other than Jeffrey Meek himself.

39.    JRL knew at the time that it filed the affidavit in the Mosti state court action that there were serious problems with the affidavit, yet nonetheless, incredibly, asked Judge Curtis to rely upon the affidavit and grant judgment against Mr. Mosti and in favor of CACV.  The summary judgment motion is still pending before Judge Curtis in the Mosti state court action.

40.     On or near October 25, 2006, CACH, by and through the JRL law firm, sued Plaintiff Karen Jennings on a Providian National Bank credit card debt. (*CACH of Colorado, LLC v. Karen Jennings*, Cause No. CIV 07-25, in the Third Judicial Circuit Court of Codington County, South Dakota) (hereafter the "Jennings state court case").  On or near January 11, 2007, CACH, by and through its counsel, JRL, took a default judgment against Ms. Jennings.  To obtain the default judgment, CACH and JRL used an affidavit bearing the name of Jeffrey K. Meek as the affiant and notarized by Hoong "Mark" Tran.  Meek and Tran were employees of WaMu and willing participants in the fictitious affidavit factory.  On information and belief, Meek did not actually appear before Tran, swear to the truth of the statements in the affidavit, or sign it.  Like many of the other fictitious affidavits generated out of the fictitious affidavit factory, the affidavit has a "/" and the initials of another person in the fictitious affidavit factory who actually signed Meek's name to the affidavit.

41.     "Martha Kunkle" was in fact Lorraine Kunkle.  Lorraine Kunkle was at all pertinent times hereto in fact an employee of WaMu.

42.     Lorraine Kunkle did not execute the Kunkle Affidavit.  The Kunkle Affidavit was signed by WaMu employee Melody Moore on behalf of WaMu.

43.     Defendant Cauthern-Munoz notarized the Kunkle Affidavit despite knowing that "Martha Kunkle" had neither subscribed or swore to it.

44.     Neither Lorraine Kunkle nor Jeffrey Meek was a designated agent of Providian National Bank as represented in the fictitious affidavits.

45.     No one was a designated agent of Providian National Bank subsequent to October of 2005 as, at that time, Providian National Bank was acquired by WaMu and ceased to be a viable legal entity.

46.     Lorraine Kunkle was the operations manager of WaMu Asset Sales Division subsequent to October of 2005 through April 2008.  On information and belief, Kunkle formulated the scheme to use and implement the WaMu fictitious affidavit factory together with Defendant John Doe I.

47.     Lorraine Kunkle was the manager and person in charge of the WaMu fictitious affidavit factory from approximately October 2005 until approximately April 2008.  During that time period Kunkle trained, directed, and managed the employees under her direction to create, sign, and mail out fictitious affidavits as described in this Complaint.  Without Kunkle, the plan and scheme to generate and use the fictitious affidavits would not have worked.  Kunkle loaned the use of the name of her deceased mother, Martha Kunkle, to the operation, and directed the others in the group to sign that name on thousands of the affidavits.  She also directed Cauthern-Munoz and the other notaries in the operation to sign the name "Martha Kunkle" or that of other purported affiants even though the purported affiants did not actually appear before the notary or swear on oath to the

truth of the content of the affidavits.  And Kunkle oversaw the operation day in and day out in the period from October 2005 until April 2008 to make sure that the participants continued to function in the manner that she had trained them.

48.     On information and belief, Jeffrey Meek joined the fictitious affidavit factory at WaMu and he too agreed to allow the fictitious affidavit factory to falsely put his name on affidavits that he did not actually sign.

49.     WaMu would place charged-off credit card accounts for sale, in bulk, to PRA, CACV, and CACH and other debt buyers who would bid on the accounts based upon such factors as the age of the accounts or whether the account holders had discharged debt in bankruptcy.  Based upon these and other factors, PRA, CACV, and CACH would purchase the debt, in bulk, for pennies on the dollar.

50.     The bidding and sale of charged-off credit card accounts between WaMu on the one hand and PRA, CACV, or CACH on the other occurred or involved the use of the internet and wire transactions involving the computer.

51.     Pursuant to the agreement between WaMu on one hand and PRA, CACV, or CACH on the other, WaMu would provide no or limited documentation to support the viability of the debt or which would constitute evidence admissible in a court of law that the debt was due and owing.  Instead, under the agreements, PRA, CACV, and CACH would be entitled, upon request, to receive an affidavit

from WaMu in a form the same as or substantially similar to the Kunkle Affidavit. WaMu on the one hand and PRA, CACV, and CACH on the other hand agreed that if PRA, CACV or CACH needed additional documentation at a later date beyond the form affidavit, it would have to pay substantial sums for such documentation in a sum unknown through WaMu's "media sales department."

52.     Upon information and belief, any time PRA, CACV, or CACH received resistance in their attempt to collect the debt sold to them by WaMu, WaMu would prepare false and misleading affidavits like the Kunkle Affidavit for WaMu to sign and return, which they could then use to deceive debtors and courts of law as to the viability of their claims.

53.     Defendants and WaMu utilized email, the internet, and mail to transmit and receive the affidavits.

54.     WaMu, through its Asset Sales division, provided PRA, CACV, and CACH with such affidavits in bulk.  WaMu's Asset Sales division operated a false affidavit factory whereby hundreds of false and misleading affidavits in a form the same or substantially similar to the Kunkle Affidavit were signed and notarized each day.

55.     Thousands (or more) of these false and misleading affidavits were concocted by WaMu employees and transmitted to PRA, CACV, and CACH and by PRA, CACV, and CACH or their respective lawyers to courts across the United

States in which PRA, CACV, and CACH filed lawsuits to collect the debts it claimed against the thousands of people they have sued.

56.     WaMu claims that it did not retain copies of the false and misleading affidavits or otherwise document when the affidavits were made or to whom the affidavits were provided.

57.     Defendant Cauthern-Munoz, pursuant to the law of Texas where she was wrongfully notarizing the false and misleading affidavits, was required to maintain a notary book of record documenting the date and identity of the affiant for all affidavits she notarized.

58.     Defendant Cauthern-Munoz failed to maintain a notary book of record.

59.     Defendant Cauthern-Munoz notarized affidavits prior to becoming a Texas notary public.

60.     Defendant Cauthern-Munoz never reviewed Texas notary law nor did she ever undergo any training as to a notary's obligations.

61.     Defendant Cauthern-Munoz would sit between or among fellow WaMu employees who would sign affidavits under the name "Martha Kunkle" or another factitious name and provide them to Cauthern-Munoz for notarization. The employees would on occasion place a "/" and their initials behind the signature of "Martha Kunkle" or other fictitious name.  Numerous WaMu employees thus

created false and misleading affidavits under the signature of "Martha Kunkle" or other fictitious names.

62.     Defendant Cauthern-Munoz routinely placed her notary stamp or seal on the false and misleading affidavits even though they were not actually signed and sworn to by the person named in the affidavits as the affiant, in violation of Texas law.

63.     All of the affidavits WaMu provided to PRA, CACV, and CACH were qualified with the language "to the best of my knowledge."

64.     All of the affidavits WaMu provided to PRA, CACV, and CACH subsequent to October of 2005 were purported to be signed by "designated agents" of Providian National Bank, which was false and deceptive as all of the people who signed or purported to sign the affidavits were, in fact, employees of WaMu.

65.     Although all of the affidavits provided to PRA, CACV, and CACH were notarized in Texas by Texas notary publics, none contained a jurat in the form required by Texas law, and none of them properly identified the specific actual persons who signed the affidavits—*i.e.*, none of them properly identified as the affiant, the person who actually signed the affidavit.

66.     PRA, CACV, and CACH took the false and misleading affidavits and utilized them to secure judgments against hundreds, and perhaps thousands, of alleged debtors.  The consequence was the putative class: (a) paid PRA, CACV,

and CACH with the false belief and understanding that the affidavits were authentic, true, and legal statements; (b) incurred unnecessary attorney's fees and costs defending lawsuits brought by PRA, CACV, and CACH; (c) lost lawsuits brought against them by PRA, CACV, and CACH wherein courts of law relied upon the affidavits as authentic, true and legal statements; (d) had their credit scores suffer with the placement of an adverse judgment on their credit reports by PRA, CACV, and CACH; and (e) suffered other consequences, unknown at this time, as a consequence of Defendants' false representations that the affidavits were authentic, true, accurate and/or reliable in a court of law as proof that the debtors owed anything.

## COUNT I

## VIOLATION OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT

**(Asserted on Behalf of Plaintiffs and the Putative Class
Against PRA, Kunkle, Cauthern-Munoz, and John Doe I Only
and Not Against CACV or CACH)**

67.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were repeated here *verbatim*.

68.     In relevant part, 18 U.S.C. § 1961(1) defines "racketeering activity" as "any act which is indictable under any of the following provisions of title 18, United States Code: [including] … section 891, … section 894 (relating to extortion in collecting or attempting to collect an extension of credit), … section

1341 (relating to mail fraud), section 1343 (relating to wire fraud), and section 1344."

69.     18 U.S.C. § 1961(3) defines "person" to "include any individual or entity capable of holding a legal or beneficial interest in property."

70.     18 U.S.C. § 1961(4) defines "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

71.     18 U.S.C. § 1961(5) provides that a "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

72.     18 U.S.C. § 1341, specifically identified by 18 U.S.C. § 1961(1) as an indictable predicate for racketeering, provides in pertinent part that: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious … article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or

artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

73.     18 U.S.C. § 1343, specifically identified by 18 U.S.C. § 1961(1) as an indictable predicate for racketeering, provides in pertinent part that: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

74.     18 U.S.C. § 1962(c) provides in pertinent part that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

75.     At all relevant times hereto, Defendants were "persons" within the meaning and scope of 18 U.S.C. § 1961.

76.     At all relevant times hereto, Plaintiffs and each putative member of the class was and is a person within the scope and meaning of 18 U.S.C. § 1961(3).

77.     From on or about October 2005 through the Summer of 2008, in the District of Montana and elsewhere, WaMu, by and through Kunkle, Cauthern-Munoz,[1] Melody Moore, and other WaMu employees unknown to Plaintiffs, together with PRA have knowingly, intentionally and/or recklessly acted as an enterprise under 18 U.S.C. § 1961(4) engaged in an ongoing, open-ended scheme, artifice and pattern of racketeering under 18 U.S.C. § 1962(c), committing tens of thousands of predicate acts of mail fraud, wire fraud, identification fraud and/or extortionate collections by knowingly and intentionally: (a) providing false,

---

[1] Plaintiffs acknowledge that the Court has announced its intention to dismiss Plaintiffs' RICO claims against Kunkle and Cauthern-Munoz.  Plaintiffs continue to allege these claims because the Court has not yet signed an Order dismissing those claims, because Plaintiffs now believe and allege that Kunkle formulated the plan for the fictitious affidavit factory with other WaMu employees unknown to Plaintiffs and that Cauthern-Munoz continued to participate in the creation of fictitious affidavits after WaMu failed and was succeeded by JP Morgan Chase Bank, N.A., Plaintiffs may ask the Court to reconsider its intention to dismiss the RICO claim against Cauthern-Munoz, and because in any event, even if the Court does not so reconsider, Plaintiffs cannot delete the allegations because they do not wish to waive or abandon the claims.

misleading and/or fraudulent affidavits to PRA; (b) providing affidavits to PRA signed by "designated agents" of Providian National Bank knowing no such legal entity existed; and (c) providing affidavits with the qualifier "to the best of my knowledge" knowing such a qualifier was below the standard required for an affiant by federal law and by the laws of virtually every state in the union, as described herein.  PRA aided and abetted in all such illicit and illegal activity.

78.     From on or about October of 2005 to September 2008, in the District of Montana and elsewhere, WaMu, by and through Kunkle, Cauthern-Munoz, John Doe I, and other WaMu employees unknown to Plaintiffs, perpetrated its pattern of mail fraud and wire fraud through its association-in-fact with PRA, and other debt buyers who used the fictitious affidavits together forming racketeering enterprises to effectuate the predicate acts of mail fraud, wire fraud, identification fraud and/or extortionate collections under the control and direction of WaMu and PRA and the other debt buyers.  PRA and the other debt buyers who used the fictitious affidavits actively participated in the affairs of an enterprise with WaMu, Kunkle, Cauthern-Munoz, and/or other WaMu employees: (a) by receiving the affidavits provided by WaMu to PRA and the other debt buyers in bulk and when it was obvious on its face that the affidavits were signed by different individuals bearing different signatures; (b) by virtue of being engaged in the purchase of credit card debt, PRA and the other debt buyers knew or should

have known that Providian National Bank was not a viable legal entity following its acquisition by WaMu; and (c) as sophisticated litigants filing tens of thousands of lawsuits against debtors, PRA and the other debt buyers knew or should have known the requirement for personal knowledge required as a predicate by most courts of law (including Montana and Texas) for affidavit practice.

79.     WaMu together with PRA constituted an enterprise for the purposes of these civil RICO claims.  WaMu and PRA  had common purposes in the scheme described here: to gain revenue from the sale and collection of the debts they asserted using the false and misleading affidavits.  In the period from October 2005 through the Summer of 2008, the enterprise had an ongoing organization and functioned as a continuing unit.  During that period, one or more employees at WaMu regularly communicated, separately, with one or more employees at PRA and other debt buyers to arrange sales of the charged off accounts.  And during that period, employees at WaMu, PRA, and other debt buyers regularly communicated to request and receive the false and misleading affidavits for PRA and other debt buyers to use in false filings in courts.

80.     WaMu participated in and conducted the affairs of the enterprises for the common purpose of making enormous illicit profits with the complicity, witting or unwitting, of the other members of the enterprise.

81.     From on or about October 2005 to September 2008, WaMu agreed with PRA and other debt buyers to sell charged-off credit card debts.  Pursuant to the agreements, PRA and other debt buyers would receive no documentation regarding the individual debtors' accounts, but instead would be given, upon request, an affidavit form the same or substantially similar to one of the affidavits attached hereto.   Pursuant to the agreements, the affidavit form would be purportedly signed by a "designated agent" of Providian National Bank, when in fact Providian National Bank had ceased to be a legal entity.  Pursuant to the agreements, the affidavit form contained the qualifier language "to the best of my knowledge."

82.     Defendants PRA, Kunkle, Cauthern-Munoz, and John Doe I committed the predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in at least the following ways.  First, they used the mails or wires on thousands of occasions to request the false and misleading affidavits from WaMu.  Second, WaMu used the mails or wires on thousands of occasions to send the false and misleading affidavits to PRA and other debt buyers.  Third, PRA and other debt buyers used the mails or wires on thousands of occasions to send the false and misleading affidavits to courts to be filed in the records of the collection lawsuits that PRA, its lawyers, and other debt buyers and their lawyers have commenced against Plaintiffs and the class they seeks to represent.  And fourth,

PRA and other debt buyers used the mails or wires on hundreds, and perhaps thousands, of occasions to send copies of the false and misleading affidavits to the persons against whom it filed those lawsuits or their lawyers.

83.     All of those uses of the mails and wires furthered the scheme by WaMu, PRA, Kunkle, Cauthern-Munoz, and John Doe I to use the false and misleading affidavits to generate the revenue and profit for Defendants as described elsewhere in this Amended Complaint.

84.     Plaintiffs cannot presently allege the specific dates of the mailings and wire transmissions they allege here because they do not have access to them. Nor can they presently identify the specific persons who, acting on behalf of WaMu or PRA, used the wires or mails in each of the occasions described above, although it seems obvious that those persons were employees or representatives of WaMu or PRA, respectively.   The records of those mailings and wire transmissions are maintained by Defendants, by the courts in which PRA and other debt buyers filed the false and misleading affidavits, perhaps by the persons against whom PRA and other debt buyers filed those lawsuits (or their lawyers), and/or by the lawyers and agents of PRA and the other debt buyers who used the affidavits. Plaintiffs will request copies of those records in discovery in this case, and when and if necessary, will further amend this Complaint to provide additional and more specific information on the dates of the mailings and wire transmissions, the

specific content of those mailings and wire transmissions, and the identities of the persons who mailed or wired them for Defendants.

85.     During the time frame alleged herein, WaMu profited from the use of its contractually-provided affidavits, including false, misleading and/or fraudulent affidavits, by being able to sell charged-off accounts for profit without having to take the time or expense to actually demonstrate, through evidence admissible in a court of law, that the debts were due, valid and owing when sold and/or by being able to sell charged-off accounts that it would not have been able to sell if it had been required to provide such evidence.

86.     During the time frame alleged herein, PRA and other debt buyers facilitated and also profited from the use of the affidavits WaMu provided, including false, misleading and/or fraudulent affidavits, by: (a) utilizing them to collect debt and prosecute claims against debtors with documentation which they knew or should have known was improper and not viable; and/or (b) utilizing them in lieu of having to pay WaMu, through its "media sales department," for actual documentation of the alleged debtors' debt in the form of actual credit card contracts, account statements and other proof of debt.

87.     But for use of the false and misleading affidavits by PRA and other debt buyers, WaMu and PRA would have been unable to effectuate the scheme to defraud courts and consumers as set forth herein, including but not limited to using

the false and misleading affidavits to substantiate the alleged debt inside or outside of litigation.

88.     As part of the racketeering schemes or enterprises described herein, Defendants have used the racketeering enterprises to expand their operations and generate enormous profits.  The interstate commerce requirement of a RICO claim is satisfied because the racketeering claims alleged herein arise out of, and are based upon, Defendants' repeated and systematic use of interstate mail and wire transfers in furtherance of the racketeering schemes alleged herein.

89.     Defendants purposely and knowingly misrepresented the form, nature, substance and viability of the affidavits provided by WaMu, by and through the employees named herein and others, which is the direct and proximate cause of Plaintiffs' and the putative class members' injury and damages.

90.     Plaintiffs and the putative class members are direct victims of Defendants' wrongful and unlawful conduct and have been injured in their business or property for the purposes of 18 U.S. C. § 1964(c).  As the direct victims of Defendants' wrongful conduct, Plaintiffs and the putative class have been injured in an amount to be determined by a jury at trial.  Because the information necessary to calculate damages is contained in Defendants' records, the Court will not need to adopt complicated rules apportioning damages in order

to obviate multiple recoveries.  Plaintiffs will seek leave to amend this Complaint to set forth the exact amount thereof when the same is discerned.

91.     As a direct and proximate result of Defendants' racketeering activities as described herein, Plaintiffs, on behalf of themselves and the putative class members, are entitled to recover treble damages for the injuries they sustained, restitution, as well as costs of suit and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

92.     As a direct and proximate result of Defendants' racketeering activities as described herein, Plaintiffs, on behalf of themselves and the putative class members, are entitled to an Order, pursuant to 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in the unlawful conduct which the enterprise has engaged in.  Such an Order should provide that Defendants cannot take any further action to collection or enforce any judgment they have obtained in any collection action in which they used one of the affidavits described here and that they just disgorge any money they already have collected on or from any such judgment.

## COUNT II

## VIOLATION OF THE FAIR DEBT
## COLLECTION PRACTICES ACT

### (Asserted on Behalf of Plaintiffs and the Putative Class
### Against PRA, CACV, CACH, and JRL)

93.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were restated here *verbatim*.

94.     PRA, CACV, CACH, and JRL are each "debt collectors" as defined by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

95.     Section 1692j of the FDCPA provides: "It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.  Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 813 for failure to comply with a provision of this title."

96.     Defendants violated § 1692j by misrepresenting, subsequent to October 2005, that the affidavits purportedly came from "designated agents" of "Providian National Bank" when in fact they came from employees and agents of Providian National Bank's legal successor WaMu and/or by having a fictitious

person, "Martha Kunkle," supposedly sign the affidavits when, in fact, there was no "Martha Kunkle" signing the affidavits.

97.     Section 1692e(10) of the FDCPA prohibits "The use of any false representation or deceptive means to collect or attempt to collect any debt … ."

98.     PRA, CACV, CACH, and JRL violated § 1692e(10) of the Fair Debt Collection Practices Act by: (1) using a name other than the true name of the debt collector's agent, business, company or organization; (2) filing affidavits which contained false, misleading, and/or fraudulent signatures and/or false acknowledgements in an attempt to collect a debt; (3) filing affidavits from individuals who falsely purported to be a "designated agent" of Providian National Bank when PRA, CACV, CACH, and JRL knew or should have known that Providian National Bank no longer existed as a legal entity; and (4) filing affidavits made "to the best of my knowledge" knowing such a qualification was below the standard for an affidavit to be admissible in a court of law.

99.     Plaintiffs and the putative class have suffered and continue to suffer damages as a result of Defendants' violations of the Fair Debt Collection Practices Act.

100.     Plaintiffs and the putative class are entitled to recover restitution, compensatory and actual damages (including punitive damages), statutory

damages, costs and attorney's fees as provided by the FDCPA and within the applicable statute of limitations.

## COUNT III

## NEGLIGENCE

### (Asserted on Behalf of Plaintiffs and the Putative Class Against CACH and CACH Only)

101.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were restated here *verbatim*.

102.     CACV and CACH owed duties of care to each of Plaintiffs and the members of the putative class to use reasonable and ordinary care and prudence in the collection of the debts that CACV and CACH claim against them.  CACV and CACH breached those duties of care, and therefore, were negligent by failing to make sure that the affidavits that WaMu provided were proper and met the standards required for the affidavits.

103.     That negligence proximately caused harm and damages to Plaintiffs and the members of the Class for which Plaintiffs request recovery.

## COUNT IV

## NEGLIGENCE

### (Asserted on Behalf of Plaintiffs and the Putative Class
### Against Kunkle Only)

104.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were restated here *verbatim*.

105.     In addition or alternatively, Kunkle owed a duty of care to each of Plaintiffs and the members of the putative class to use reasonable and ordinary care and prudence in the preparation of the affidavits used to collect the debts that PRA, CACV, and CACH claim against them.  Kunkle breached the duty of care, and therefore, was negligent by allowing other employees of WaMu to sign her deceased mother's name to legal documents that Kunkle knew or should have known would be used by PRA, CACV, CACH, and other debt buyers in legal proceedings throughout the country.

106.     That negligence proximately caused harm and damages to Plaintiffs and the members of the Class for which Plaintiffs request recovery.

## COUNT V

## VIOLATION OF NEW HAMPSHIRE UNFAIR, DECEPTIVE OR UNREASONABLE COLLECTION PRACTICES ACT

### (Asserted on behalf of Plaintiffs and the Putative Class Against All Defendants)

107.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were restated here *verbatim*.

108.     Pursuant to the choice of law provision contained in Plaintiffs' and the putative class' credit card contracts with Providian National Bank, New Hampshire law applies to the credit card transactions.  Plaintiffs, and the putative class, are entitled to rely upon substantive New Hampshire law pursuant to the choice of law provision.

109.     PRA, CACV, and CACH as assignees to the Providian National Bank credit card contracts, are bound by the choice of law provision to follow, abide and comply with New Hampshire law in all respects.

110.     Section 358-C:3 of the New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act (hereafter "N.H. FDCPA") provides in pertinent part: "any debt collection or attempt to collect a debt shall be deemed unfair, deceptive or unreasonable if the debt collector … [m]akes any material false representation or implication of the character, extent or amount of the debt, or of its status in any legal proceeding."

111.     PRA, CACV, CACH, and JRL violated the N.H. FDCPA by: (1) using a name other than the true name of the debt collector's agent, business, company or organization; (2) filing affidavits which contained false, misleading, and/or fraudulent signatures and/or false acknowledgements in an attempt to collect a debt; (3) filing affidavits from individuals who falsely purported to be a "designated agent" of Providian National Bank when PRA, CACV, CACH, and JRL knew or should have known that Providian National Bank no longer existed as a legal entity; and/or (4) filing affidavits made "to the best of my knowledge" knowing such a qualification was below the standard for an affidavit to be admissible in a court of law.

112.     Kunkle and Cauthern-Munoz knowingly joined in, participated in, and assisted in the violations, and therefore, should be held jointly and severally liable for the violations.

113.     Plaintiffs and the putative class have suffered and continue to suffer damages as a result of Defendants' violations of the N.H. FDCPA.

114.     Plaintiffs and the putative class are entitled to recover restitution, compensatory and actual damages (including punitive damages), statutory damages, costs and attorney's fees as provided by the N.H. FDCPA and within the applicable statute of limitations and without limitation to the individual Defendant's net worth.

## COUNT VI

## VIOLATION OF NEW HAMPSHIRE UNFAIR TRADE PRACTICES ACT

### (Asserted on behalf of Plaintiffs and the Putative Class Against All Defendants)

115.     Plaintiffs repeat and re-allege all of the Paragraphs above as if they were repeated here *verbatim*.

116.     Section 358-A:2 of the New Hampshire Unfair Trade Practices Act (hereafter "N.H. UTPA") provides in pertinent part: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

117.     Section 358-C:4 of the N.H. FDCPA provides in pertinent part: "Any violation of the provisions of this chapter shall also constitute an unfair and deceptive act or practice within the meaning of RSA 358-A:2 (the N.H. UTPA) …."

118.     Defendants' violations of the N.H. FDCPA constitute *per se* violations of the N.H. UTPA.

119.     Plaintiffs and the putative class have suffered and continue to suffer damages as a result of Defendants' violations of the N.H. UTPA.

120.     Plaintiffs and the putative class are entitled to recover compensatory and actual damages (including punitive damages) of not less than

double nor more than treble actual damages, statutory damages of $1,000 per violation, costs and attorney's fees as provided by the N.H. FDCPA and within the applicable statute of limitations and without limitation to the individual Defendant's net worth.

121.    Plaintiffs and the putative class are further entitled pursuant to the N.H. UTPA to injunctive relief to the furthest extend equitable principles allow this Court to address and remedy widespread and systematic false and fraudulent affidavit practices as set forth herein.

## COUNT VII

## BREACH OF OFFICIAL DUTY

### (Against Defendant Cauthern-Munoz Only)

122.    Plaintiffs repeat and re-allege all of the Paragraphs above as if they were repeated here *verbatim*.

123.    Plaintiffs Cole and Switters invoke for themselves and the putative class they seek to represent that cause of action provided under Texas law against a Texas notary public for breach of an official duty by a notary public.

124.    Defendant Cauthern-Munoz breached her official duties as a notary public as described in this Amended Complaint, and thereby, caused Plaintiffs Cole and Switters and the putative class actual damages.  More specifically, Defendant Cauthern-Munoz breached her official duties by notarizing the false and

misleading affidavits even though they were not actually signed and sworn to before her by the person named in the affidavits as the affiant and/or by notarizing affidavits without identifying in the jurats with the affidavits the specific actual persons who really signed the affidavits.

125.     Plaintiffs Cole and Switters and the putative class have suffered and continue to suffer damages as a result of Defendant Cauthern-Munoz's breach of official duties.

## CLASS DEFINITIONS, ALLEGATIONS AND INJURY TO THE CLASS

126.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and 358-A:10a of the N.H. UTPA.  Plaintiffs seek certification of a class under Rule 23.

127.     Class Definition: The class is composed of all persons against whom Defendants used (either directly, through an attorney or agent, or through a legal filing) an affidavit substantially similar to the affidavit form reflected in Exhibits "B" and "C" of this Second Amended Complaint.

128.     Numerosity:  The class is comprised of thousands of persons and is so numerous that joinder of all members is impracticable.

129.     Commonality:  There are questions of law and/or fact common to the class.  The claims/defenses of Plaintiffs as the representative parties are typical

of the claims/defenses of the class.  Further, the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and include, without limitation, the following:

a.      Whether PRA and WaMu through their employees and Kunkle, Cauthern-Munoz, and Defendant John Doe I conducted the affairs of an enterprise and/or participated in a pattern of racketeering activity.

b.      Whether Defendants violated § 1692j of the FDCPA by misrepresenting, subsequent to October 2005, that the affidavits purportedly came from "designated agents" of "Providian National Bank" when in fact they came from employees and agents of Providian National Bank's legal successor, WaMu.

c.      Whether PRA, CACV, CACH, and/or JRL violated § 1692e(10) of the FDCPA by: (1) using a name other than the true name of the debt collector's agent, business, company or organization; (2) filing affidavits which contained false, misleading and/or fraudulent signatures and/or false acknowledgements in an attempt to collect a debt; (3) filing affidavits from individuals who falsely purported to be a "designated agent" of Providian National Bank when they knew or should have known that Providian National Bank no longer existed as a legal entity; or (4) filing affidavits made "to the best of my knowledge" knowing such a qualification was below the standard for an affidavit to be admissible in a court of law.

d.      Whether Defendants violated the N.H. FDCPA.

e.      Whether Defendants violated the N.H. UTPA.

f.      Whether CACV, CACH, and/or Kunkle were negligent.

g.      Whether the class is entitled to compensatory relief.

h.      Whether the class is entitled to statutory relief.

i.      Whether the class is entitled to injunctive relief.

j.      Whether the class is entitled to declaratory relief.

k.      Whether the class is entitled to attorney's fees and costs.

130.    Typicality and Adequacy:  Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class members they seek to represent, and they are similarly situated with members of the class.   Plaintiffs, as representative parties of the class, will fairly and adequately represent and protect the interests of the class.  Furthermore, Plaintiffs' interests are not antagonistic to the class.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

131.    Predominance:  Common questions of fact or law predominate over individualized issues.  The facts surrounding Defendants' enterprise of producing and utilizing false, misleading and/or fraudulent affidavits will predominate over any individualized issues because this case centers on such conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the

controversy.  The interest of members of the class in individually controlling the prosecution of separate actions is not great given the amount in controversy and the difficulty of detection of the enterprise and proof of it; it is desirable to concentrate this litigation in one forum and there are no known difficulties likely to be encountered in the management of a class action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the putative class, respectfully request that judgment be entered against Defendants for the all damages to which they are entitled to under Federal law and New Hampshire law as follows:

a.    Declaratory judgment that the conduct of PRA, Kunkle, Cauthern-Munoz, and John Doe I violated RICO.

b.    That the conduct of Defendants violated the FDCPA and New Hampshire law.

c.    Actual damages in an amount to be determined by trier of fact.

d.    Statutory damages as determined by the trier of fact and including $1,000 per class member.

e.    Treble damages.

f.    Costs and reasonable attorney's fees.

g.    Punitive damages.

h.     Injunctive relief precluding PRA, JRL CACV, and CACH from collecting or attempting to collect on any Providian National Bank credit card debt without proper authentication and proof of said debt.

i.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs continue their demand for a trial by jury of all of the issues in this action.

DATED this _____ day of November, 2009.

Respectfully submitted,

EDWARDS, FRICKLE & CULVER

HEENAN LAW FIRM

BINGHAM & LEA, P.C.

By:___/s/ John Heenan_____
          Attorneys for Plaintiffs

S:\BRB\CLIENTS\2164.59\Pleadings\THIRD AMENDED COMPLAINT--11-12-09.doc